### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Christopher F. White, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.       I make this affidavit in support of an application for a search warrant for records and information associated with certain cellular towers ("cell towers") that is in the possession, custody, and/or control of the following telecommunications providers (collectively, "Wireless Providers"):

      a.       **AT&T**, a cellular service provider headquartered in North Palm Beach, Florida;

      b.       **T-Mobile**, a cellular service provider headquartered in Parsippany, New Jersey; and,

      c.       **Verizon**, a cellular service provider headquartered in Bedminster, New Jersey.

2.       The information to be searched is described in the following paragraphs and in Attachments A1-A3.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) and Fed. R. Crim. Pro. 41 to require Wireless Providers to disclose to the government the information further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3.       The facts in this affidavit come from my personal observations and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Arson, 18 U.S.C. § 844(i), have been committed by an unknown person. There is also probable cause to search the information described in Attachments A1-A3 for evidence of these crimes as further described in Attachment B.

5.     This Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district of the United States that has jurisdiction over the offense being investigated, see 18 U.S.C. § 2711(3)(A)(i) and Fed. R. Crim. Pro. 41.

## AGENT BACKGROUND

6.     I am a Special Agent with the Federal Bureau of Investigation (FBI) in Kansas City, Missouri, and have been assigned to this office since November 2023, following graduation from the FBI Academy in Quantico, Virginia. I am currently assigned to the FBI Kansas City Division's Joint Terrorism Task Force (JTTF), which is comprised of law enforcement officers from several state and local law enforcement agencies in Kansas and Missouri. As a member of the JTTF, I am responsible for investigating violations that contribute to matters of Domestic Terrorism, which includes, but is not limited to, threatening interstate communications and the distribution of information relating to explosives, destructive devices, and weapons of mass destruction. While conducting investigations, I have assisted on interviews, surveillances, search warrants, and arrest warrants. Prior to being hired by the FBI, I was a police officer and detective for eight years investigating various criminal violations. Through my experience, education, and training, I have become familiar with methods and tradecraft utilized by individuals to communicate or engage in activities in support of domestic terrorism. I have gained this knowledge through my training at the FBI Academy and my daily work related to domestic terrorism investigations. As a Special

Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

7.     I have experience in the investigation, apprehension and prosecution of individuals involved in criminal offenses, the use of cellular devices to commit those offenses, and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their location. I know from training and experience that cell phone users normally have their cell telephones with them, so identifying cell phones in an area, or multiple areas, will assist in identifying those associated with the violation being investigated.

8.     Those involved in criminal activity may have one or more cell phones and may be in contact with other associates regarding the crimes. These contacts may be before, during, and even after a crime has been committed in an area. Therefore, not only is identifying the cellular devices within a specific geographic area evidence of those involved, but identifying who they may be in contact with can also provide evidence of those individuals currently unknown to law enforcement. In order to obtain all this information and based on the varying records, retention and information by the cellular providers, a request for voice, text, data and specialized location information is being requested.

9.     I have spoken with other law enforcement officers or agents regarding the operation of cellular phones and cellular phone networks. In particular, this information included historical cell site analysis, basic cellular analysis and geospatial mapping of cellular records. The information provided instruction in basic principles of cellular networks, how call records provided by the major cellular providers are created, reading and understanding call detail records, and utilizing call detail records in investigations to illustrate a cellular phone's general location. I am aware of the basic principles and concepts of a cellular network and how a cellular device connects

with a cell site; how to interpret the historical records provided by the major cellular providers, such as AT&T, T-Mobile, and Verizon. I am also familiar with how mapping software is used to depict the general location of a cellular device when it connects to a cellular network; the capabilities and limitations of cellular record analysis; and interpreting and analyzing cellular records from all major cellular providers.

10. In speaking with others regarding how cellular networks operate, how a cellular phone interacts with the network, and the types of records that are generated, I know that as a phone interacts with the network (such as voice, text, data, or registration events) that details of that interaction are maintained by the cellular service provider such as AT&T, T-Mobile, and Verizon. The records can include the phone numbers with whom the cellular device was in contact with (whether through and incoming/outgoing voice or text) and the tower and sector utilized for the connection and the duration of the connection. Other information such as records of data session and specialized location data such as Timing Advance, RTT (real time tool), LocDBoR (Location Database of Record), or similar, discussed further below, may be available depending on the provider and retention period. This additional information can include a distance from the tower and an estimated latitude and longitude of where the network believes the device is located. Your affiant notes that the latitude and longitude provided by the network is generally calculated and that the accuracy can vary widely and will not be able to identify a cell phone to an exact location but only a geographic area.

11. I am aware people commonly carry cellular telephones and cellular service providers record information about the usage events and subscriber information when those phones are used. I am aware that cellular telephone networks work through a series of cell sites with antennas that service a limited area and direction. Some of the data recorded by all cellular service

providers typically includes records identifying the device, phone number, general locations, times and duration of all voice calls, text messages, and data connections. I know that all cellular service providers maintain records of calls, they are also aware that some service providers also retain records of a phones interaction with the network which may be contained in Timing Advance, RTT, or LocDBoR, or similar records which are specialized engineering records from the various cellular providers.

## **PROBABLE CAUSE**

12.     On August 30, 2024, officers with the Parkville Missouri Police Department were called to the Chase Bank located at 9000 NW Missouri 45 Highway for a property damage report. The bank was not yet open and still under construction. The officers met with Z.G., the Project Superintendent for AL Huber Construction Company. Z.G. informed officers that an unknown person had spray painted nine Stars of David on the building; next to one of these Stars were the letters "TKD." The incident occurred sometime between August 29, 2024, at 6:00 PM and August 30, 2024, at 5:50 AM.

13.     The officers took photographs of the graffiti. Z.G. told officers that the cost to repair, clean and possibly replace the damaged façade could be about $10,000. Below are photos taken by the responding officers:











14.     The Star of David is a generally recognized symbol of both Jewish identity and Judaism. The letters "TKD" have historically been known to be an abbreviation of the phrase "Total Kike Death."

15.     On September 10, 2024, at approximately 7:27 PM, S.K., who worked for Woodley Building Maintenance, was cleaning at Chase bank. She observed a vehicle drive through the parking lot twice at a slow pace. It appeared to be a silver SUV driven by a white male in his 20's or 30's. S.K. thought that it was suspicious and she felt that the driver may have been casing the bank.

16.     On September 11, 2024, at approximately 3:58 AM, officers with the Parkville, Missouri Police Department were dispatched to the Chase Bank to the report of an arson at the bank. The South Platte Fire Department was also dispatched to the bank to the report of a smoke alarm going off inside the business. When South Platte Fire Department arrived on scene, they

reported a "Molotov Cocktail" had been thrown onto the Automated Teller Machine (ATM). When fire department personnel were in the process of extinguishing the fire at the ATM, the interior room leading to the interior side of the ATM also sustained heavy damage as the fire department needed to force entry into the room to ensure the fire was completely contained.



17.    When officers arrived on scene, they reported seeing a message spray painted on the north side of the building that read, "Jews did 9/11". There was a trail of orange spray-painted lines on the windows on the north side of the bank wrapping around the west side windows. There was a Star of David spray painted on the sign for the bank.



18.    Officers reported seeing multiple glass windows on the west side of the building to have bullet holes. Officers reported the following: a large window on the west side of the building was shattered, but still mostly intact. There was a smaller window directly below this window that was broken out, but had been intentionally broken out by the fire department to help with ventilation of the building after extinguishing the fire. A smaller interior glass window inside of

the office space was shattered as well. Towards the south end of the west side of the building there was another large glass window that was shattered. This window, and the damaged window on the north end of this side, had small holes in the glass, which were consistent with a bullet penetrating the glass. The bullet had also penetrated an interior office wall and a third large pane of glass on the southwest corner of the building.



19.     Officers reported the drive through ATM on the southside of Chase Bank had been set on fire and the keypad area of the ATM had scorch marks. Officers located remnants of green glass and a red rag that appeared to be the rag used to ignite the improvised incendiary device on the ground below the ATM.

20.     Officers reviewed the surveillance footage from Chase Bank and observed the following: on September 11, 2024 at 03:47AM, the building's north side camera showed a subject exiting the wooded area near the northwest corner of the parking lot.



21.     The subject walked across the parking lot southbound to the main entrance/exit doors to the building. The subject goes directly to the camera dome located above the doors and attempts to spray paint the lens, but is only partially successful. The subject spray paints the words "Jews did 9/11" on the dark colored wall tile. The subject then walks west across the north side of the building while painting a line across all the windows, doors and siding. The subject then walks around the northwest corner of the building and continues spray painting lines across the windows.



22.     The subject had a red colored cloth hanging out of the subject's back pocket. The subject walked to the roadside business sign and spray painted a Star of David. The south camera showed the subject walking along the stone retaining wall along the south side of the property as the subject prepared the improvised incendiary device. The red rag, which was previously seen in the rear pocket of the subject was no longer seen. The subject was seen from the ATM's camera lighting the top of the bottle on fire in the subject's left hand. The subject threw the bottle against the face of the machine. The contents inside the bottle did not initially catch fire as the subject started to run away after throwing and breaking the bottle. The subject quickly stopped when the fire did not start and then stepped back in front of the ATM and used a lighter to manually light the liquid on fire, which covered the ATM.



23.     The male appeared to be a white male, wearing a gray hooded sweatshirt, black face mask and black gloves. After lighting the fire, the subject ran around the east side of the building, across the north parking lot and into the wooded area on the north side of the property. At 3:54 AM, the large window on the northwest corner of the building was seen shattering. Officers conducted a search of the area and located a rifle-style shell casing lying on a retaining wall, near

the Whataburger, located at 9110 NW 64th St, Parkville, MO 64152. The shell casing was located approximately 400 feet from the damaged window. The damage to the building was estimated at $500,0000.

## **TECHNICAL INFORMATION**

24.     In my training and experience, I have learned that Wireless Providers are companies that provide cellular communications service to the general public.  In order to provide this service, many cellular service providers maintain antenna towers (cell towers) that serve and provide cellular service to devices that are within range of the tower's signals.  Each cell tower receives signals from wireless devices, such as cellular phones, in its general vicinity.

25.     By communicating with a cell tower, a wireless device can transmit and receive communications, such as phone calls, text messages, and other data.  When sending or receiving communications, a cellular device does not always utilize the cell tower that is closest to it. Additionally, cellular service providers such as Wireless Providers also capture historical transactional and location data that is generated and derived from a cellular device's interaction with the cellular network. This information may include the cell tower and sector utilized for the interaction and a cellular device's distance from a particular cell tower and network derived location, which are generally estimates, of the device in latitude and longitude.

26.     Based on my training and experience, I also know that each cellular device is identified by one or more unique identifiers.  For example, with respect to a cellular phone, the phone will be assigned both a unique telephone number but also one or more other identifiers such as an Electronic Serial Number (ESN), a Mobile Electronic Identity Number (MEIN), a Mobile Identification Number (MIN), a Subscriber Identity Module (SIM), a Mobile Subscriber Integrated Services Digital Network Number (MSISDN), an International Mobile Subscriber Identifier

(IMSI), or an International Mobile Equipment Identity (IMEI). The types of identifiers assigned to a given cellular device are dependent on the device and the cellular network on which it operates.

27.     Based on my training and experience, I know that cellular providers, such as Wireless Providers, routinely and in their regular course of business maintain certain types of location data associated with a cellular device based on that cellular device's interaction with the cellular network. For each interaction with the Wireless Provider's network, these records may include:

  a.     the cellular telephone number and/or unique identifiers of the wireless device that connected to the provider's cellular tower (the locally served wireless device);

  b.     the telephone number that is in contact with the cellular telephone utilizing a provider's cellular tower;

  c.     the cellular tower(s) on the provider's network, as well as the "sector" (*i.e.*, face of the tower), to which the locally served wireless device connected;

  d.     the distance from the tower and sector that the cellular device was located;

  e.     the estimated latitude and longitude of the cellular device; and

  f.     the date, time, and duration of the interaction.

28.     The aforementioned location information is often contained within the call detail records (which include voice, text, or data transactions) and the specialized location information such as Timing Advance data, Real Time Tool (RTT), and/or LocDBoR data that is captured and controlled by Wireless Providers.

29.     I am aware that the cellular providers all have different records and capabilities when tower and area searches are requested by law enforcement. Furthermore, different

information is obtained from each type of request which can provide evidence of the aforementioned violations being investigated, including the approximate location of a device across one or more events or locations and/or who a device consistent with the facts of the investigation may be in contact with before, during, or after the time of an incident.

30. In responding to requests for voice, text, and data, providers will provide voice records with some text and data records, depending on the provider. In all cases, the records from cellular providers will contain originating and destination phone numbers which can provide evidence of what devices interacted with the cellular tower before, during and after the incident. Multiple towers will often provide coverage to a single area and that in rural areas towers over five miles apart can provide service to the same area. T-Mobile will generally not provide all towers that provide coverage to an area, and therefore, in order to have T-Mobile and AT&T provide additional towers that provide coverage in/around the general area, a search distance is being provided and is based on a review of the cellular network where the violations(s) occurred. Additionally, the time period is being requested to capture travel into, around and out of the locations identified by the unknown subject(s).

31. Providers maintain specialized location information (previously reviewed as Timing Advance, RTT or LocDBoR) in the course of normal business and can produce the information upon request. The Timing Advance and LocDBoR information is searched based on "estimated locations" of the cellular devices by the network, which is not a finite GPS location, and should not be treated as such. Estimated locations can vary based on the network environment, sources of the location estimate, and any data points used by the cellular provider to calculate the location estimate. Specifically, AT&T cell sites are generally less dense than T-Mobile, so it is

necessary to request a larger search area in order to identify the devices consistent with the facts of the investigation.

32.     Based on my training and experience, I know that cellular providers, such as Wireless Providers, have the ability to query their historical records to determine which cellular device(s) interacted with a particular cellular tower during a given period of time and to produce the information described above.  I also know that cellular providers have the ability to determine which cellular tower(s) provided coverage to a given location at a particular time.

33.     Based on my training and experience and the above facts, information obtained from cellular service providers such as Wireless Providers that reveals what devices interacted with a particular cell tower (and, where applicable, sector) and thus can be used to show that such devices were in the general vicinity of the cell tower at the time of the interaction.  Thus, the records described in Attachments A1-A3 will identify the cellular devices that were in the vicinity of 9000 NW Missouri 45 Highway Parkville, Missouri, on September 18, 2024, from 3:15AM CDT to 4:15AM CDT to provide agents with data to eliminate possible devices not involved in the crime.

34.     On October 16, 2024, FBI Kansas City obtained signed search warrants, through the United States District Court for the Western District of Missouri for AT&T, Dish Wireless, T-Mobile, and Verizon, in reference to 24-SW-00477-WBG, 24-SW-00478-WBG, 24-SW-00479-WBG and 24-SW-00481-WBG, seeking records from August 30, 2024, from 3:00AM CDT to 4:00AM CDT, September 10, 2024 from 7:15PM CDT to 8:15pm CDT; and September 11, 2024, from 3:15AM CDT to 4:15AM CDT.

35.     The second search warrant is to obtain records described in Attachments A1-A3 for the same location, the same day of the week, and the same timeframe of when the arson occurred.

The purpose of this second search warrant is to assist law enforcement in eliminating devices, which were connected to the network, and should be in the area, such as residents living in the vicinity of the towers. For example, if records showed the same device within the same area on August 30, September 10, and September 11, 2024, compared with the records from September 18, 2024, then it is safe to assume that the device is possibly a resident living within the area of the tower and can be eliminated as a possible subject. This method is similar to that of obtaining DNA from a victim/witness to compare and eliminate against the collected sample.

36.     Based on consulting authority in the field and as previously discussed above, that multiple search parameters are required based on the type of data and specific provider in order to obtain the requested information.  These search parameters are outlined in Attachments A1-A3.

37.     The government will utilize an investigative unit independent of the instant investigation, the FBI's Cellular Analysis Survey Team (CAST), to review the data provided by the Providers.  The CAST Unit consists of approximately 100 Special Agents and Taks Force Officers dispersed throughout the United States that are certified as experts in cellular technology and the analyses associated with these investigative techniques.  The CAST Unit is considered the leading authority on tower dumps and timing advance area searches within the law enforcement community. In this particular case, members of the CAST Unit will attempt to isolate mobile devices of interest from the datasets produced by the Providers while excluding uninvolved third parties.  With respect to the tower dumps, the CAST asset will review the datasets in conjunction with the known timeline of the criminal offenses under investigation.  By obtaining tower dump information that contains a buffer of time prior to and after the offenses, a CAST asset can identify devices that were present for the duration of the search and exclude those devices as likely being

associated with a local resident.  Using this same technique, a CAST asset can identify mobile devices likely associated with the subject of the investigation or potential witnesses, by locating those devices that arrive in the area and depart from the area at times consistent with the known timeline.  Furthermore, since the subject was not observed manipulating a cellphone during the criminal act, those devices that show outgoing activity during the timeframe where the subject is present on surveillance video can also be excluded.  Once mobile devices of interest have been identified for each date that the subject was present at the crime scene, these devices can be compared across time to determine if they were present on more than one occasion.  Beyond what is described above, the CAST asset will utilize additional criterion to further scrutinize the data such as devices that remain on a single antenna for the duration of the dataset versus devices that appear to be non-stationary.

38.     In addition to these techniques used to analyze the tower dump information, the CAST asset will utilize the distance from tower information contained within the timing advance area search to isolate mobile devices that fall within the appropriate distance calculation based upon the distance of the crime scene from the tower.  This allows for the immediate exclusion of devices that are consistently too close to the tower or too far from the tower to be present at the crime scene.  The devices located at the correct distance from the tower can then be further dissected to identify and exclude devices that remained at that distance for the duration of the record versus devices that appear at the appropriate distance while the subject is present at the crime scene then depart the area consistent with known fact patterns.  In certain instances, the tower dump and timing advance area search can be cross-referenced to find commonalities between the datasets to further refine the results.  Once the CAST asset has completed the analysis, they will compile a report containing a list of mobile devices that display characteristics that are

consistent with the known facts of the case. This report will only identify devices that may be related to the case and will omit any mobile device determined to be unrelated to the case. This report will be provided to the investigative team for further investigation.

## AUTHORIZATION REQUEST

39.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c).

40.     I further request that the Court direct Wireless Providers to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Wireless Providers, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

41.     Upon receiving the requested information from Wireless Providers, law enforcement will analyze the information to identify devices that have the following characteristics:

   a.     Devices associated with cellular network records that place those devices at the relevant location at the relevant times; and/or,

   b.     Devices associated with cellular network records that indicate the device traveled to the relevant location immediately before a known incident and left immediately after.

42.     The information provided in response to this warrant will be analyzed and reviewed for the limited purpose and scope of identifying those responsible for the violation(s) and potential witnesses to those violations.

43.     No subscriber information (including but not limited to name or phone number associated with the identifiers) or location information outside the initial search criteria is sought or authorized by this warrant.

## **NON-DISCLOSURE**

44.     I request, pursuant to 18 U.S. C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice, and order the cellular service provider not to notify any other person of the Court's order, until one year after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such as disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1) and § 2705(b).

Respectfully submitted,

Christopher F. White
Special Agent
FBI

Subscribed and sworn to ~~before me~~ on __April 28_____, 2025.
                    Telephonically at 3:11 p.m., with signatures confirmed

HONORABLE JILL A. MORRIS
UNITED STATES MAGISTRATE JUDGE